First, let me thank the court again for taking our case out of order and helping with my travel plans. I wish I could say we're glad to, but thank you. May it please the court, Jonathan Lipsky for appellants. The district court in its order does recite the testimony of plaintiffs correctly, namely that Mr. Shalaby's testimony is to the fact that he was relighting a campfire at a campground that he had lit earlier in the evening. He knelt down to light the campfire with this map torch, which is a nozzle attached to a canister, and instead of the firewood being ignited, it was he who wound up being ignited. That is all the evidence you need in this case, at least to survive summary judgment. What you have there is, of course, causation, although the district court managed to not find causation. I mentioned that the torch itself, the product, was a substantial factor in his being injured. In fact, it was the only factor. Unfortunately, from our perspective, the district court instead focused on, in effect, the manufacturing process of this torch or cylinder in particular, and found that, of course, that was complicated. In this day and age, all mass-produced items have a complicated fabrication procedure, but that does not go to causation. Causation is simply that this was a substantial factor as California law. But didn't we – weren't there three witnesses that said they heard that Mr. Shalaby – that they heard Mr. Shalaby kicked this cylinder? And how is there a material – issue of material fact on this point? Well, first of all, the record – this is all hearsay. It was – none of the actual witnesses – none of the actual first responders heard this from Mr. Shalaby. It was a campground in San Diego. And so, of course, when something like this happens, Mr. Shalaby was burned over a large portion of his exposed skin. Twenty percent of his skin needed skin grafts. So when something like this happens, of course, there are a lot of explanations floating around. Another explanation was that he was banging it. Another was that he was lighting a water heater. But the question of summary judgment is, of course, what is plaintiff's evidence? And that is to be believed. There is, of course, a conflict in the evidence, but that's what we have trials for and juries for. It's not for the district court to decide. Your position is even disregarding the expert's testimony, excluding the testimony of any experts you believe is enough to go past summary judgment. Oh, absolutely. In California, we have two tests for design defect, which is what – at least one of the causes of action alleged here. The more simpler to make out case is, of course, the consumer expectation test, in which the jury is to determine based on the circumstances alleged, which, again, on summary judgment is plaintiff's evidence, given those circumstances and general familiarity with the product. This product is available at Home Depot and other hardware stores. Worthington, one of the defendants' own testimony, indicates that over the past three to five or six-year period, they themselves have manufactured about 2.4 million of these canisters. So it's a widely distributed property – excuse me – product, and that is the consumer expectation test, assuming you can show causation, which is apparent, although the court below did not find it to be so, and foreseeable use, which, again, we have to take Mr. Shalaby's testimony as true at this stage. Now, the jury, of course, is not bound to believe anyone, but on summary judgment, the court is bound to believe plaintiff's testimony. The other test is the risk-benefit test. If the circumstances are more complex, the leading California case is Sewell v. General Motors. In that case, we have an enhanced injury case, where a woman is driving her car, struck by another car. Obviously, it's a high-speed impact because their car is going opposite each other, each going 20 or 30 miles an hour, and her ankles are broken. In that case, plaintiffs had alleged that it was a faulty construction of the wheel and other assemblages down at the floorboards that enhanced her injury. In that case, you do need experts. It's a complex matter. The matters of evidence and proof are quite difficult. That is not this case. But even if it is this case, the burden under California law is simply to point, in effect, to the challenge design. In this case, we know, based on both of the arranger's testimony, who examined the torch that failed before it was discarded, we know from their testimony that there was a crack at what is called the center housing, which is basically the neck portion where the threads are, where the nozzle screw is on, where that connects to the body of the cylinder itself. So that is the design flaw that a plaintiff points to in this benefit test in this case, which is that the center housing was brazed, which is another word for welding, a form of welding, to the cylinder. And that's the allegation there. The California case is made clear when it's come up. Bresnahan is one such case. McCabe is another. But the Barker v. Lull, which is the case which articulated the risk-benefit test and the consumer expectation test, makes clear that once a plaintiff has met these burdens, even under risk-benefit, he has no additional burden. It's the defendant's burden to show that the benefits of the challenge design, in this case, again, where the neck connects with the body of the cylinder, that the benefits of that design outweigh the risk of the design. In this case, I'll just point out that the defendants have not even articulated any of the risks or benefits of this design. They've simply asserted it was a risk-benefit test, I think under the assumption that the plaintiff needed an expert to make out his case, which is patently untrue, and haven't articulated any of the other elements of risk-benefit. In other words, they haven't. Is your contention that this product was designed improperly or manufactured improperly, or both? It may very well be it was manufactured improperly. However, we do not have the torch any longer. That would be a very difficult case to make out, that it was a manufacturing defect. But certainly design defect encompasses it, encompasses what happened here, which is that we know where the item failed. We don't know why it failed. Well, and that could be for two reasons, couldn't it? It could be that, one, the design was defective, and that led to the failure, or otherwise, the design was fine, but when they built this, made this particular torch, they did something wrong in making it. Right. Either of those could have caused the accident. Right. But the point is, and unfortunately, the district court did not seem to address this head-on. First of all, it did not even articulate the standards for risk-benefit test. But under, excuse me, under, okay, we were talking about the juncture of the neck to the body, that under either of these tests, I'll have to return to that. Would you repeat the question, Your Honor? That, well, design defect or manufacturing defect, it could be either. The point is, though, that it's a legal test. It's not a layperson's test. The California cases make that clear. It's a matter of legal definition, defect. It's not what you and I would think is defect, which is we point to the thing that failed. It's a test. It's either it violates the consumer expectation standard for defect or the risk-benefit standard for defect, or, of course, manufacturing. The question I have about that, then, doesn't it require the jury to conclude whether, how, and why the brace joint failed, which is an issue, I would think, beyond the grasp of an ordinary juror, without the assistance of a qualified expert. Now, your experts were not qualified, but. Well, the fact of the matter is the California cases make clear that the plaintiff has met his burden under the risk-benefit test, that he's identified the defect. It is then the defendant's burden to show how the benefits of this design outweigh the detriments of it, the risks of it, which we know is, of course. How is he going to find the defects if you don't have the expertise? Well, you just simply have to point. You have to identify what it is that failed. I think that's what the case is saying. But I would like to obviously get to the experts. But let's say, aside from the experts, what have you established that would get you past summary judgment? Well, we've established causation. I don't think I trust the Court will see there's causation here. The question, then, is defects, which this Court is rightly asking about. But the California cases make clear that the cases use words like demonstrate and proof. These are matters for the jury. But the important thing is that since the defendant is the manufacturer's product, the California cases have articulated it crystallically clear that the burden is on the defendant to explain how the benefits of the design outweigh the risks. It's not really defendants doesn't have access to the product or the design of the product. I mean, the Court wanted the plaintiff to, the plaintiff's experts to have put forward alternative tests for the product, alternative designs for the product and have tested them. But there's no California case that supports that this is somehow plaintiff's burden. I mean, Barker v. Lull and the Sewell case make that apparent. Before I reserve the rest of my time, I should just get briefly to Rule 702. It's our contention that the experts should certainly not have been excluded. In a footnote, the district court acknowledged that his metallurgical testimony, he's a Stanford professor and a former head of metallurgy at San Jose State University. He's certainly an eminent metallurgist. And the court said that defendants were not even challenging that he had carried out all the tests under generally accepted principles, which was, of course, the former Frye test. For 70 years, it was the law, the federal law, the common law, that this was I suppose if you didn't have the, as you don't in this case, the torch, if you had an expert on designing torches, a real expert on torches, this expert could say, well, if this is what happened, there are only two possible causes of this and explain the two causes. Or maybe he said, in considering everything, it seems clear that the most logical explanation for this was so-and-so. But that's not this case. That's not what these witnesses said. Neither of these witnesses was an expert in building torches, were they? In making this, building this type of torch. Well, no, these are metallurgists who are doing something that's done in industry, obviously thousands of times a day, which is testing the strength of metal and welds. But she was an expert in warnings on these. And that's not your claim, is it, that they failed to give adequate warning of the danger? Well, that is a separate claim, but I only obviously have so much time before this Court, so I can't address every matter. You don't even know what warning was on this torch, do you? Well, I think from the deposition, the warning was read into the record. And obviously a warning expert doesn't have to know anything about the particular product. They have to know about how you warn consumers. I mean, the Court used the incorrect test for that as well, but again, I only have so much time. But I do want to stress Rule 702. What's being argued over here is conclusions. I'll point out, and Defendant Worthington can address this, but Defendant Worthington has actually referred to two of the six or seven tests that our expert performed as proving that the torch is strong. I mean, I've never seen a case where you're trying to exclude an expert in 702, but you're citing his test results. I mean, the case has an Alice in Wonderland aspect to it from that standpoint. The Court acknowledged that what was formerly the gold standard and still is for reliability. I mean, we have a lot of standards we try to allow for developing areas of expertise, but metallurgy is a longstanding expert practice, and all of his tests were generally accepted. The Court never explained how any of the factors it alleged to test his conclusions against were relevant, which, again, is something required under 702. He just goes through an ad hoc approach to the various things and never really addresses how it is that the reliability that we fail under that standpoint. Of course, relevancy is pretty straightforward. The expert tested the manufacturer's own torches, so it's highly relevant. It's not as if he was trying to extrapolate from cancer research on mice to say how an individual may have gotten cancer from Bendectin or something of that nature or PCBs, so there's no huge gap between the data and what he's expressing an opinion on either. We've got one minute left. I'll be right back. Thank you. May it please the Court. Richard Urgo for Worthington Industries Appellee. Counsel for Burns and Mack and I have agreed to divide the issues into time. I've reserved seven and a half minutes for myself, and Ms. Naylor has reserved the same amount. I'm going to cover the Daubert issues, the admissibility of the expert testimony. Ms. Naylor will cover the motion for summary judgment issues, the risk-benefit and consumer expectation issues. Daubert. The essence of the Daubert standard is to promote fundamental fairness to all parties. Cases should only be determined on expert testimony that is determined to be reliable. Neither the plaintiff nor the defendant should be permitted to offer expert testimony that's not grounded in the scientific method. Cases should not turn on emotionally charged assertions by experts that they can't back up with good science. And rather, plaintiffs and defendants should have the confidence that the trier of fact will only hear expert testimony that the trial court has determined to be relevant and also to be the product of scientifically valid reasoning and methodology. Are you referring in particular to Dr. Anderson's testimony? Yes. All right. Yes. And I'll go right to Dr. Anderson's testimony. His opinions are that the brazing on the cylinder was inadequate and that the braze joint in the accident cylinder failed, resulting in this accident. The issue isn't whether he is by happenstance correct in that opinion. The issue is, does he have a scientifically valid reason for asserting that opinion? And we submit that he has not established any of the criteria that would make his opinion reliable or to have a reliable basis for his opinion. The first thing he does is attack the braze joint for having porosity. But he has conducted no testing whatsoever to determine whether the levels of porosity he found pose any particular danger or has not done any testing to determine what levels of porosity would, in fact, constitute a danger. He doesn't know of any peer-reviewed studies regarding levels of porosity and their relationship to whether a joint is safe or not. He doesn't know of any standards. And essentially, he has failed to link the existence of porosity with any defect or unreasonably dangerous condition. One of his claims about the problem of the braze joint is his belief that the melting point of the braze paste itself was less than the temperature of the braze furnace. And I'll acknowledge, if that were the case, we would have many problems with our cylinders and many problems with braze joints because there wouldn't be a good joint. But his belief was based on a misassumption of what the composition of the braze paste was. He felt it was copper and nickel. In fact, it's copper, nickel, and phosphorus, and that lowers the melting point. And the evidence was that the actual melting point of the braze paste was substantially below the temperature of the braze furnace. This was pointed out to Dr. Anderson two times in supplemental expert reports before his deposition. But even at his deposition, he stuck to his guns that the braze paste wasn't being adequately heated. The furnace wasn't turned on hot enough. And he has failed to correct that issue even today, even though he has submitted several declarations since that time. Another claim that he's made is, well, actually, he rules out the possibility that in this accident cylinder that there was a failure in the parent metal as opposed to a failure in the braze joint. But he has no basis for doing that. First of all, he's never seen the cylinder. If there was a failure in the metal, then who's responsible? That's not his theory. He doesn't have a theory for a problem with the metal. He has a theory as to the braze joint. But you have a theory of the metal. What are the possible causes of this? Abuse. This is steel. These things don't shatter at the mere tapping. What Dr. Anderson says is, I think the braze joint's the problem. See the porosity and the temperatures of the furnace is not hot enough? He's all about the braze joint. He rules out the possibility that there's anything wrong, that there was a failure in the parent metal. Even though... But if there were a failure in the parent metal, who would be responsible? The manufacturer? If there was a defect that accounted for that failure in the parent metal, yes, but not if it was subject to abuse. You've got to have a theory of defect. His theory of defect is that this braze joint is so brittle that, with very nominal force applied to it, it fails and results in a leak. He doesn't have a theory as to why the parent metal would fail, or could fail, with very nominal force. If the parent metal failed, would that be enough to raise the question of fact as to why it failed? Not if you don't have a theory to link it to. He doesn't have a theory. Dr. Anderson has not articulated a theory of defect related to the parent metal. His theory is limited to the braze joint, and under Galbert, all we can examine is the basis for his theory, not some theory he hasn't articulated. Well, I was just asking for consumer expectation. If the product fails, is that enough to raise the question of fact and consumer expectation? Well, I'm respectfully going to defer that question to counsel for Burns & Maddock, who's prepared to argue the consumer expectations. But going on, as to Dr. Anderson, he rules out the failure of the parent metal, even though his own testing, where he applies 30 foot pounds of force, which he says is more than the normal amount of abuse. He gets a failure in the parent metal in one, and a failure in the braze joint in another, and yet rules out the possibility that Mr. Shalby's cylinder failed in the parent metal. Well, Dr. Anderson claims that this cylinder should be redesigned to flare the valve back or to put in a shield or donut to spread out the forces, but he has not ever designed a cylinder in that fashion. He's never seen a cylinder designed in that fashion. He hasn't attempted to test this design. He's not aware of any peer-reviewed studies regarding this design. He doesn't know about any potential failure rate or standards, and he doesn't know if this design is generally accepted within the manufacturing and scientific communities. So in summary, as to Dr. Anderson, his opinions are not grounded in the methods of procedure in science. Rather, his opinion is based on his unsupported subjective belief, and under Daubert, the trial court did not abuse his discretion in excluding his testimony. Thank you, counsel. Thank you. May it please the Court, Beth Naylor on behalf of the Burns-O-Matic appellees. Judge Reinhart, I'd like to get to your consumer expectation question, but I first wanted to address Judge Nelson's original question regarding the testimony from the first responders to the accident the night in April in 2006. And in the supplemental expert record at 440, we have the deposition testimony of the supervisory EMT, Mr. Russo, and he was supervising at that time a junior EMT, Kevin Price. Kevin Price is the one that actually wrote the report for the EMT slash fire department. Mr. Russo says, and I quote when asked where did he get the information that went into the report, I have his initial, his Kevin, of what Kevin got, and I stood over him, and my best recollection was I remember the patient stating that he kicked something. He kicked the thing into the fire and it exploded. Question, did he elaborate at the time on what he meant by thing? Answer, he did say it was a propane. Question, so you understood that he was telling you that he kicked some type of compressed gas cylinder into a campfire basically? Answer, yes. And just a point of clarification, these compressed gas cylinders come with different types of gas. This particular cylinder had not gas, but they also come in propane gas. So generically a lot of people refer to them as propane cylinders, and that's why we had the difference in asking about the propane. With respect to Judge Reinhart's questions on consumer expectation, the Stevens Court, which is cited in our papers, basically sets out the general rule that expert testimony is needed for a product defect claim in California. However, it's clear that the law does permit the consumer expectation test as one of two ways to establish a design defect only, not a manufacturing defect, not a failure to warn defect, only a design defect. The California Supreme Court's most recent discussion of the consumer expectation test is contained in Sewell, again cited in our papers. In that case, the Sewell Court said that the consumer expectation test is reserved for cases where the product performs so unsafely that the defect is apparent to common reason, experience, and understanding of its ordinary consumers. That's simply not the case here. From the extensive record of the district court, we know we have ordinary consumers of this product. One of them is one of the park rangers, Ranger Radcliffe, who was one of the first responders to the scene. He was a Navy Seabee. He's very familiar with these cylinders and these torches. He got there. He's one of the few people that got to see the cylinder after the accident, and upon questioning as to the details of what he saw and what he thought happened, his conclusion was abuse. His conclusion was abuse. I suppose you didn't have him, and you just had the plaintiffs. I'm sorry? When? Before the district judge. We did have Ranger Radcliffe, and we also had Mr. Schauer. The question is, is that a question of fact, a dispute between the ranger and the plaintiff? Not necessarily, Your Honor, because I'm going to focus solely, because we don't want to create a genuine issue of fact, I'm going to focus just solely on Mr. Schauer and his retained experts' testimony. Okay. That's why I asked you the question. Okay. Thank you. And that's where I was going. Another perhaps ordinary consumer of these products, by his own deposition, testimony, and own admissions, is Mr. Schauer. Mr. Schauer has, as you know, put forth many different theories about the defect, or the proposed defect in this case. The first theory that was espoused through his former expert, Dr. Anderson, was the bad braze theory. Mr. Schauer has moved on from bad braze. Now there's problems with the fracture groove and the trigger lock button and the forces and the interrelationship between the forces, between the torch and the cylinder, and things like that. But one thing's clear. The defect is not apparent. The consumer expectation test is for a situation where you have a three-legged stool and people fall over. That's apparent. Here, something happened, something very unfortunate happened that night, but the defect is not apparent. Therefore, we need technical and scientific evidence. In fact, the information that's coming forth from Mr. Shalaby and his retained expert is highly technical, more technical than the information that was put forth in the Sewell case, where the California Supreme Court said that the theory was too technical and too mechanical for the consumer expectation test to apply. I submit, in this case, if we were to put all this information where we're talking about braze furnaces and braze specifications and braze pace, where, in Dr. Anderson's opinion, he's referring to Hansen's constitution of binary alloys and measures things on the energy dispersion spectrum. I can't even say it. That is not something that the lay juror can digest and can issue a good decision on. These lay jurors, few if any of them are going to have any experience with this product. And here we have an ordinary consumer in Ranger Radcliffe concluding one thing, an ordinary consumer in Mr. Shalaby concluding multiple different things as to what may or may not have happened. This defect is not apparent, and that's required by the Sewell court for applying the consumer expectation test. Let me give you an example. Suppose I was driving a Toyota or a Lexus. Stay away from Toyota, right? Lexus. Parking in the courtyard right here. Pull it up against the fence, and it spurts ahead and knocks down the wall and goes into a garden, a beautiful garden. And I say, you know, I stepped on the brake, and this is what happened. Is that enough to get by somebody's judgment? Your Honor, that is not the facts of the case that we have here. No, it's not the facts. But what we have, we have something different. I don't understand what you need. I don't know. I'm not an expert. I just say what happened. Okay. And that's not what's supposed to happen when you step on the brakes. That's right. And Mr. Shalaby was asked point blank in his deposition whether or not he told EMT Kevin Price that he kicked the thing into the campfire. Mr. Shalaby did not deny it. He simply said, I certainly don't remember saying anything like that. Then we have the deposition testimony of Kevin Price. I'd just like to ask you a hypothetical question if I could get an answer. Okay. I pulled my Lexus up to the fence. I stepped on the brake, and instead of stopping, it spurted ahead. And if that was all that was in the record, that may be. And, again, I'm not an expert in cars and Lexuses, so I don't necessarily know what all it takes. But that could be. But if you had told the responding police officer, it's all my fault, I'm so stupid, I can't believe it, I did this, then guess what? That's what's in the record. And there is no issue of fact. I respectfully submit, Your Honors, that the record of the district court is very challenging. As you see, there were mounds of paper that we submitted to all of you. And what we have here is a situation where constantly changing stories and theories of the case have created conflicts. But they're being created all by the non-moving party. Under Rule 56, the non-moving party can't be the one that's creating the issue of fact. Otherwise, Rule 56 has no meaning. It's not useful. Why would we have it? In this situation, all the conflicts in the testimony are simply being created by the non-moving party. You see, my time is out. Thank you. Thank you very much. Okay. We'll give you a full, let's see, yeah, two minutes. Thank you. Thank you, Your Honor. Well, as I hope it's clear, particularly from Burns and Maddox's counsel, for whatever reason, I think because of the district court's order, they want to argue this case as if it were a trial. These are disputed matters of fact. If you say that you set your foot on the brake and the Lexus lurched ahead, that's a matter the jury has to decide. And basically, it's a credibility question. Do they believe you? Or are they going to believe probably Toyota's experts that say this can't happen, which is just what we have here. The testimony is that Mr. Shalby was relighting the campfire. He used the same torch earlier. Well, the question really is, if I tell that story, do I have to then produce an expert who says what the cause is, whether it's a defect in the brake, in the rug, in the, or whatever it is. I mean, that's the dispute for the jury to decide. The consumer expectation test says if it's. Don't I have to give some theory of what the defect is? The circumstances, what we have in summary judgment, are plaintiff's testimony. And also plaintiff's wife, Sonia Ruiz Dunn, also testifies that a moment before she turned her back, she was heading to the bathroom. She saw him about to light the campfire, and then she actually saw the fire reflected in their recreational vehicle. In most of the cases in California, you have to have an expert. I think you're suggesting that for consumer expectation, you don't need an expert. Well, it's a question of complex causation. For some reason, the defendants cite the Stevens case, which is a tire blowout case. Tires blow out for all sorts of reasons. What we have here is an allegation that the torch was being used in a reasonable manner, reasonably foreseeable manner, and it failed catastrophically. You cannot analogize this case to a toxic torch or a tire case where to show causation, you have to lead to a lot of other possible causes. Here, we know what caused the injury. The question is what happened, and that's not the use of the torch. Right. Abuse. That's a jury question. That's not something we can decide here based on what the park ranger says. And let me just point out one thing about this kitchen of the fire theory. When you look at the record, you'll see that Dr. Eager also discounts that theory, and Worthington has tested what they say is 24,000 burst tests, which is basically putting the torch in heat and seeing what happens. It's not supposed to explode, because that's the federal allegations say it's not. It always vents out, and if it does explode, it fractures into shrapnel, which is clearly not what happened here. So this is a complete red herring. And Worthington does not assert or can't assert, based on their own brief, that the kitchen of the fire would be analogous to a burst test, and the burst tests do not fail at the braze joint. They fail like a shrapnel bomb. So I don't know why the defendants keep asserting this, but those are disputed facts. Those are not – I think they use some term about a fact that's not disputed, but we don't have anything like that. We don't have a tire, which everyone can look at and say that's the tire, and they measure it and see. I mean, in that case, you have one piece of evidence here. You just have people's versions of what happened, and the only eyewitnesses are Mr. Shalaby and his wife to what happened. The rest is just other people's guesses, and there will be no witness coming to court saying that he kicked it into the fire or banged it.  I don't think there's any evidence to back up this argument. I think it's just about based on where the ranger said the crack was, that this must have happened, that it had to have been abused, that their products never fail if it's not abused. But, you know, we have evidence to the contrary. Thank you, counsel. Thank you. The case here, sir, will be submitted. We will return at 1.45.
judges: Friedman, Nelson D. W., Reinhardt